# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,   )
                               )  No. 8:22-cr-00259-WFJ-AEP
      Plaintiff,            )
                               )
vs.                             )
                               )
PENNY HESS,             )
                               )
      Defendant.         )

## MOTION TO DISMISS INDICTMENT

Defendant, PENNY HESS, by her attorneys, Leonard C. Goodman and Angela J. Reaney, pursuant to Federal Rule of Criminal Procedure 12(b)(2) and the First Amendment to the United States Constitution, hereby moves this Honorable Court to dismiss the indictment. In support of this motion, defendant states as follows:

### Introduction

The African People's Socialist Party (APSP) was founded in 1972 by Defendant Omali Yeshitela. The Party's platform can be found on its website, "apspuhuru.org."[1] The APSP supports the rights of African people throughout the world to be free from colonialism, described as "a condition of existence where a whole people is oppressively dominated by a foreign and alien state power for the purpose of economic exploitation and political advantage." The APSP believes that all black people are African people and are a part of a single national entity. It believes that the "vast resources of Africa"

---

[1] *The Working Platform of the African People's Socialist Party*, African People's Socialist Party, https://apspuhuru.org/about/platform/ (adopted Sept. 23, 1979).

belong to the African people and not to Western colonizers. It also advocates "free speech and political association, a guarantee of the right to work for the betterment and emancipation of black people without fear of political imprisonment and the loss of life, limb, and livelihood."[2]

The APSP oversees a broader network of organizations and programs which collectively comprise the overall "Uhuru Movement."

The APSP publishes its own newspaper called, *The Burning Spear.*[3] Its Uhuru House community center in St. Petersburg houses a radio station operated by a non-profit organization affiliated with the broader Uhuru Movement.[4] During its half century of existence, the APSP has consistently championed several issues. First, it seeks "reparations, just economic compensation," for the "theft of human and material resources from Africa and its people" and for "the centuries of genocide, oppression, and enslavement of our people."[5] Second, it opposes "U.S. and Western European political, economic, and military interference in the affairs of Africa and African people throughout the world."[6]

Third, the APSP and Uhuru Movement oversee programs that support the

---

[2] *Id.*

[3] The Burning Spear, https://www.theburningspear.com.

[4] Black Power 96 Community Radio, https://blackpower96.org/.

[5] *See supra* note 1.

[6] *See supra* note 1.

economic development and well-being of African people. This includes three centers in the United States: in St. Louis, Missouri, in St. Petersburg, Florida and in Oakland, CA. Through these centers, Uhuru-affiliated organizations operate farmers markets, recreation programs and training programs for African women to become doulas. The Uhuru Movement also operates several businesses, including Uhuru Foods & Pies and Uhuru Furniture and Collectibles.

As part of its advocacy on behalf of African peoples, the APSP chairman and other party members regularly travel to foreign countries and participate in conferences. In 1981, the Chairman attended the Managua Conference in Solidarity with the FSLN government of Nicaragua.[7] In 1983, the Chairman went to Belfast, Northern Ireland to speak.[8] In 2002, the Chairman was the keynote speaker at the 8th Congress of the Pan Africanist Congress of Azania, in Umtata, South Africa.[9] In 2004, the Chairman spoke at the Global African Conference in Suriname that resolved to demand reparations.[10] In 2006, the Chairman traveled to Southern Africa and met with former Namibian

---

[7] *The First International Conference in Solidarity with Nicaragua*, The Burning Spear, Mar. 1981, at 9, https://ufdc.ufl.edu/AA00069330/00074/images/8.

[8] *Irish Republican Socialist Party Under Attack*, The Burning Spear, July 1983, at 9 https://ufdc.ufl.edu/AA00069330/00100/images/8.

[9] *Chairman Omali Speaks in South Africa: 'The Revolution in Occupied Azania Has Not Been Completed!'*, The Burning Spear, Feb.-Mar. 2003, at 18, https://ufdc.ufl.edu/AA00069330/00204/images/17.

[10] *We must build organizations of professional revolutionaries to overturn imperialism!*, The Burning Spear, Apr. 2005, at 22, https://ufdc.ufl.edu/AA00069330/00218/images/21.

president, Sam Nujoma.[11] In 2007, the Chairman was the keynote speaker at a conference in Huelva, Spain, sponsored by a Spanish NGO.[12] In 2012, the Chairman spoke on the legacy of Marcus Garvey in London, Paris, Berlin, Brussels and Stockholm.[13] In 2015, he also spoke at a conference in Jamaica.[14] In 2019, the Chairman traveled to Oxford Union to participate in a debate on African Unity.[15]

In 2015, APSP Chairman made two trips to Moscow to attend conferences arranged by Defendant Ionov and his group called the Anti-Globalization Movement of Russia (AGMR). Contrary to the allegations in the indictment, APSP did not conceal the Party's associations with Russia and Russians.[16] Rather, the APSP described its trips to Moscow in the Burning Spear, the same way it described its other trips.[17]

---

[11] *Founding President of Namibia endorses the International Reparations Tribunal!*, The Burning Spear, Apr.-Jul. 2006, at 1, https://ufdc.ufl.edu/AA00069330/00223/images.

[12] *Omali Yeshitela's keynote at the Congresso Internacional in Huelva, Spain - November 13, 2007*, The Burning Spear TV, https://www.youtube.com/watch?v=9NrIAW3mfXY&t=2s.

[13] *Chairman Omali storms Humboldt University!*, The Burning Spear, Dec. 2012, at 3, https://ufdc.ufl.edu/AA00069330/00246/images/2.

[14] *IRIE FM Jamaica radio celebrates Marcus Garvey's birthday, Chairman Omali Yeshitela keynote speaker*, The Burning Spear, Aug. 2015, at 9, https://ufdc.ufl.edu/AA00069330/00275/images/8.

[15] *Chairman Omali Yeshitela at Oxford Union: The Africa Debate (Documentary)*, The Burning Spear, https://theburningspear.com/2419/ (Feb. 13, 2019).

[16] See Superseding Indictment, ¶26m.

[17] *A look back at 2015: a year of black resistance, organization and struggle!*, The Burning Spear, https://theburningspear.com/1707/ (Dec. 30, 2015) ("Moscow, Russia: The Anti-Globalization Movement of Russia invites the African People's Socialist Party and Chairman Omali Yeshitela to attend the roundtable conference of the Federation of Russian Migrants"); *Chairman Omali Yeshitela speaks for Africa at Moscow world conference*, The Burning Spear,

## The Superseding Indictment

The superseding indictment charges three members of the APSP – Omali Yeshitela, the founder and chairman of the APSP, Penny Hess, a leader of a component of the APSP, and Jesse Nevel, a member of a component of the APSP – with violations of 18 U.S.C. § 951 and with a related conspiracy to violate 18 U.S.C. § 951. The indictment alleges that after attending the May 2015 Anti-Globalization Movement (AGMR) conference in Moscow, the APSP "entered into partnership" with Defendant Ionov (or with Ionov's group, AGMR) "to publish pro-Russian propaganda, as well as other information designed to cause dissension in the United States and to promote secessionist ideologies." Superseding Indictment ("SI") ¶¶ 1-2, 26(c). According to this indictment, Ionov is a Russian national and his organization, "AGMR was funded by the Russian government through government grants." SI,¶ 6.

The superseding indictment offers few details about the alleged "partnership" agreement between APSP and Ionov (or AGMR). Overt Act ("OA") #2 alleges: "On or about May 20, 2015, defendant Ionov caused an electronic message to be sent to defendant Hess stating that the purpose of defendant Yeshitela's trip to Russia would be to 'communicate on future cooperation.'" Later, the indictment states that Ionov described this partnership with APSP in a January 16, 2021 Russian language report, as a "bilateral cooperation program." OA 63. The indictment next refers to a remark by

https://theburningspear.com/1594/ (Nov. 3, 2015).

Yeshitela "that the APSP had 'developed a relationship with forces in Russia.'" OA 23. The indictment also cites a February 1, 2016, Facebook messaging conversation in which Yeshitela told Ionov: "However, it must be understood that we entered this relationship with the Anti Globalization Movement of Russia as ALLIES, not employees!" Facebook Business Record, pp. 319-320.

The indictment alleges that following the 2015 trip to Moscow, APSP became a foreign "agent" of Russia within the United States, requiring the defendants to register with the Attorney General of the United States under 18 U.S.C. § 951. The indictment alleges that by failing to register with the Attorney General as Russian agents, the three APSP defendants violated 18 U.S.C. § 951, a crime punishable by up to ten years imprisonment.

The indictment describes overt acts allegedly performed by the APSP in furtherance of its partnership agreement with Ionov. All of these overt acts involve the APSP defendants expressing their views and beliefs through published articles, public speeches and political activity. In other words, the indictment targets only the advocacy component of APSP's work, and not its economic development work or its programs to support its community.

The indictment alleges the following "overt acts" relating to the APSP Defendants:

1. In May 2015, APSP Chairman traveled to Russia for a meeting. Overt Acts ("OA") 4, 16.

2.      The APSP supported a United Nations petition alleging that the United States had committed genocide against African people. OA 8-12.

3.      The APSP sought funds and received about $7,000 from Defendant Ionov to support a 4-city speaking tour on the issue of reparations, during January 2016. OA 19-26.

4.      The APSP published an article titled, "Imperialists ban Russia from 2016 Olympic Games! APSP says 'let Russia play.'" OA 30.

5.      APSP Defendant Nevel ran for local office in St. Petersberg.[18] OA 31, 45-52.

6.      In April, 2020, APSP Chairman spoke at a "Dialogue of Nations" zoom conference hosted by Ionov. OA 56.

7.      In May 2020, the APSP recorded a video message "congratulat[ing] the residents of the Russia-backed Donetsk People's Republic." OA 58.

8.      In February and March 2022, APSP Defendants made speeches expressing opposition to the U.S. involvement in the crisis in Ukraine and in solidarity with the people of Russia and their elected government and leadership.[19] OA 68-70.

9.      APSP Defendants allowed Defendant Ionov to deliver a speech "at a video conference hosted by the APSP concerning the Russian invasion of Ukraine, stating that Nazis were in power in Ukraine and were killing

---

[18] The indictment does not allege that Nevel's decision to run for office or his campaign had anything to do with Russia. The indictment merely alleges that Defendant Ionov paid attention to Nevel's campaign and was favorably disposed to it. The indictment alleges that Ionov sent an email "requesting an interview with Nevel to talk about ... Nevel's plans to seek local office, and offering AGMR's assistance to Nevel, including 'campaign finance.'" OA 31. It also alleges that Ionov sent a voice message to a Russian officer claiming to have contributed $450 to Nevel's campaign. OA 48. However, the indictment does not allege that Nevel or the APSP ever received or accepted any financial contributions from Russians or from any foreign nationals for Nevel's campaign for public office.

[19] *OmaliTaughtMe Sunday Study: on Russian and Ukraine*, The Burning Spear TV,https://www.youtube.com/live/m5T00oNC4XE?feature=share&t=105 (Feb. 27, 2022).

innocent people, and that Russia had invaded Ukraine only to stop the killing of Russians by the Ukrainian army." OA 70.

10. Speaking at a March 2022 press conference hosted by the APSP, Defendant Yeshitela stated, "the African People's Socialist Party calls for unity with Russia in its defensive war in Ukraine against the world colonial powers," and he criticized a United States social media company that had placed content restrictions on posts that supported Russia's invasion of Ukraine. OA 71.

11. An APSP member expressed support for Putin and Russia in a private email. OA 73.

12. In March 2022, the APSP hosted a video conference concerning the Russian invasion of Ukraine during which Defendant Ionov stated that "anybody who supported Ukraine was also supporting Naziism and white supremacy." OA 75.

## ARGUMENT

## I. SECTION 951 IS UNCONSTITUTIONAL AS APPLIED TO MS. HESS AND THE OTHER APSP DEFENDANTS.[20]

### A. The Indictment in this case directly targets political expression, a core First Amendment right.

The government here is prosecuting the APSP defendants under 18 U.S.C. § 951, a statute that criminalizes unregistered foreign agents operating in the United States. To be an "agent of a foreign government" under Section 951, a person must "agree[] to operate . . . subject to [foreign] direction or control." *United States v. Rafiekian*, 991 F.3d 529, 540-41 (4th Cir. 2021) (citing Statute). "[A] person," however, "does not become

---

[20] This Motion to Dismiss is filed on behalf of Defendant Penny Hess, whom the indictment alleges "facilitated communications between Ionov and Yeshitela." Superseding Indictment ¶ 13. However, the arguments set forth in this motion apply equally to all three APSP Defendants, and it is anticipated that Defendants Yeshitela and Nevel will file separate motions adopting the arguments set forth in Hess's Motion to Dismiss.

an 'agent' for purposes of § 951 simply by acting in accordance with foreign interests . . . ." *Id.* at 541. Section 951 "is a general intent crime, and knowledge of the notification requirement need not be proven by the Government." *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010). At least one federal circuit has held that a conviction under Section 951 requires only "for the jury to conclude that [the defendant] took acts of some kind on behalf of [foreign government] without first registering as a foreign agent." *United States v. Sami Koshaba Latchin*, 554 F.3d 709, 715 (7th Cir. 2009).

Although Section 951 "has its roots in the Espionage Act of 1917," it has been rarely used by the government. *Rafiekian*, 991 F.3d at 538. In *Rafiekian*, the defendant was prosecuted under Section 951 for entering a secret agreement with the government of Turkey to help foster the criminal prosecution and extradition of Gulen, a Turkish preacher living in Pennsylvania who President Erdogan blamed for an attempted coup, and to lobby Congress for public hearings on Gulen and his activities. 991 F.3d at 533-34.

Here, the APSP defendants are not charged with helping Russia achieve any particular action item in the United States, such as gaining extradition of a wanted dissident, freeing a prisoner, or obtaining relief from sanctions. Nor are they charged with espionage or fraud. Compare *United States v. Campa*, 529 F.3d 980 (11th Cir. 2008) (defendants charged under Section 951 with committing espionage on behalf of Cuba); *United States v. Dumeisi*, 424 F.3d 566, 570 (7th Cir. 2005) (defendant charged under Section 951 with acting as a spy for Iraqi intelligence); *United States v. Duran*, 596 F.3d

1283 (11th Cir. 2010) (defendant charged under Section 951 with committing bribery and extortion on behalf of the Venezuelan government).

This case is about pure political speech and the right to advocate dissenting views. The Overt Acts charged in the indictment all relate to political speech and peaceable assembly. The APSP defendants are accused of speaking at conferences, peaceable rallies and at multi-city speaking tours. They are accused of publishing articles in their own newspaper, including an article written by a foreign national. Most of the charged conduct targets their public criticism of official U.S. policy with respect to Russia and Ukraine. The indictment attempts to criminalize speeches in which defendants criticize NATO expansion eastward to Russia's border, the 2014 U.S.-backed coup to remove Ukraine's Russia-friendly president and replace him with a U.S./EU puppet regime, and U.S. policy to arm Ukraine "to the teeth." Defendants are alleged to have committed additional crimes by making speeches blaming the United States for provoking Russia's 2022 invasion of Ukraine.[21]

Every one of these charged offenses are protected political speech under the First Amendment. "Our form of government is built on the premise that every citizen shall

---

[21] For example, Overt Act 68 in the indictment charges defendant Yeshitela with making a speech on February 27, 2022, in which he criticized NATO encroachment "800 miles towards the border of Russia." He also condemned the 2014 "CIA coup against the government [of Ukraine] that refused to come into the EU, and refused to unite with the west, against Russia." He described Ukraine as a country "armed to the teeth by the white colonizers"; "a place that Russia could not retreat any more" and as "a dagger pointed right at the heart of Russia." *OmaliTaughtMe Sunday Study: On Russia and Ukraine*, The Burning Spear TV, https://www.youtube.com/live/m5T00oNC4XE?feature=share&t=105; at 32:00-34:00 (Feb. 27, 2022).

have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights." *NAACP v. Button*, 371 U.S. 415, 431 (1963). See also *Buckley v. Valeo*, 424 U.S. 1, 40 (1976) (political expression is "at the core of our electoral process and of the First Amendment freedoms"). The First Amendment "protects vigorous advocacy, certainly of lawful ends, against governmental intrusion." *NAACP v. Button*, 371 U.S. at 429. It was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer v. Grant*, 486 U. S. 414, 421 (1988).

None of the targeted speech of the APSP defendants was in itself unlawful or had any tendency to incite "imminent lawless action." See *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Nor did it contain any obscenity which might fall outside First Amendment protections. See *Roth v. United States*, 354 U.S. 476 (1957) (obscene speech and writings are not protected by the constitutional guarantees of freedom of speech and the press). Rather, the indictment here targets only protected speech.

In summary, the government here is using Section 951 to prosecute members of an activist group for political speech and activism in opposition to U.S. foreign policy. In so doing, this prosecution strikes at the heart of the First Amendment.

**B.      The Government cannot, consistent with the First Amendment, criminalize or restrict political speech except to prevent grave and immediate danger.**

"[F]reedoms of speech and of press, of assembly, and of worship ... are susceptible of restriction only to prevent grave and immediate danger to interests which

the State may lawfully protect." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943). See also *Collins*, 323 U.S. at 531-32 (intrusion is supported "upon this domain, only if grave and impending public danger requires this"). Any attempt to restrict political speech "must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger." *Collins*, 323 U.S. at 530.

> [W]hatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly.

*Id.*

Of course, Americans are not permitted to abuse their First Amendment rights "to incite to violence and crime." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937).

> The people through their legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.

*Id.* at 364-65.

**C.** **The Superseding Indictment does not allege any clear and present danger to justify its attempt to criminalize the protected political speech of the APSP defendants.**

The superseding indictment does not allege that the APSP Defendants' writings and political speeches created a grave and immediate danger that might justify their arrest and prosecution. Instead, the indictment is based upon a premise that protected speech can be criminalized if the speaker has a relationship to Russia. This premise is false and must be rejected.

Initially, it must be noted that the APSP Defendants have a well-documented history of opposing U.S. efforts to interfere in other countries that predates Yeshitela's visit to Moscow by at least four decades. Thus, the suggestion in the indictment that the APSP defendants were speaking for Russia when they blamed the United States for provoking Russia into invading Ukraine is plainly untrue, on its face.

Even a quick perusal of the archives of the APSP newspaper, The Burning Spear, and their published speeches, shows example after example of the APSP's opposition to NATO expansion and U.S. interference in Ukraine. In a 1982 Burning Spear article, the APSP described NATO as a western military alliance designed to "dominate the colonized peoples of the world."[22] In 2011, the APSP opposed the "U.S.-led NATO war on Libya" which it described as an "attempt to recolonize the continent by imposing

---

[22] *Malvinas back under British Rule: Argentina Junta and Imperialism both lost*, The Burning Spear, Jul. 1982, at 22 https://ufdc.ufl.edu/AA00069330/00088/images/21.

U.S. military outposts throughout Africa."[23] Related Burning Spear articles criticized then-President Obama for his "betrayal of Africa."[24]

In April 2014, more than a year before the APSP Chairman's trip to Moscow, it published an article in The Burning Spear called, "Ukraine, Russia, EU, U.S. and the crisis of imperialism." This article criticized U.S. interference in Ukraine, and U.S. involvement in a "coup" that overthrew "democratically-elected president Viktor Yanukovych" and installed a "U.S./EU puppet regime."

> It is certain that the Ukrainian coup leaders/conspirators were funded by the U.S.. U.S. government operatives were in control of the demonstrations and left no room for compromise until their mission was accomplished—the immediate overthrow of Yanukovych's government and the reinstallation of a U.S./EU puppet regime.[25]

In this article, the APSP sides with Russia in its struggle to prevent Ukraine from becoming aligned with NATO and the west. It supports Russia's actions in taking back Crimea and recognizing it as part of Russia. It describes in great detail and with derision NATO's expansion eastward since the collapse of the Soviet Union "at the expense of Russia's national pride, influence, security, and economic interests."

---

[23] *U.S.-led NATO war on Libya is futile Africa recolonization effort*, The Burning Spear, https://theburningspear.com/694 (Oct. 24, 2011).

[24] *Libyan President Gaddafi murdered by imperialist lynch mob*, The Burning Spear, https://theburningspear.com/776/ (Oct. 21, 2011) ("Obama belongs to the class of historical traitor figures that includes the likes of Mobutu, Bokassa, Compaore, and the sell-out ANC, which voted for the UN resolution that gave NATO airplanes the legal cover to bomb Libya and murder Gaddafi and African peoples in Libya.").

[25] *Ukraine, Russia, EU, U.S. and the crisis of imperialism*, The Burning Spear, Apr. 20, 2014, https://theburningspear.com/1279/.

The APSP's opposition to U.S. involvement in the coup that overthrew Ukraine's democratically-elected president in 2014 is consistent with the Party's longstanding opposition to U.S. involvement in coups and regime-change operations in all parts of the world, dating back at least to 1953 when the CIA helped overthrow Muhammad Mosedeh of Iran, and install "their puppet."[26]

---

[26] A 2012 Burning Spear article summarizes APSP's political opposition to all U.S.-backed regime-change operations:

Well, we see how the international capitalist class reacts when an election does not go their way and threatens their profits. They revert back to the barrels of guns.

Muhammad Mosedeh was duly elected by the people of Iran, but overthrown in 1953 by a U.S. CIA-led coup that put their puppet, shah Reza Palivi in power.

The shah committed horrendous crimes against humanity as he stole the people's wealth until the 1979 Iranian Revolution forced him from power.

Patrice Lumumba was duly elected as the first Prime Minister of the Democratic Republic of Congo in 1960 only to be kidnapped and murdered by CIA-led mercenaries in the service of U.S. and Western imperialism, also to be replaced by U.S. puppets.

Kwame Nkrumah, the first democratically elected President of Ghana, was overthrown a U.S. CIA coup d'etat in 1966.

In 1973 a U.S.-orchestrated coup murdered and overthrew the democratically elected government of Salvador Allende, installing U.S. puppet Augusto Pinochet in Chile; Jean-Bertrand Aristide was elected by approximately 70 percent of Africans voting in the 1991 Haitian elections, only to be kidnaped by U.S. agents and forced into exile in South Africa, to be replaced by U.S. puppets.

U.S. backed forces attempted to overthrow the democratically elected Hugo Chavez presidency of Venezuela in 2002. In 2009 a U.S.-backed coup ousted Manuel Zelaya, the duly elected president of Honduras.

\*\*\*

Countless attempts have been made on the life of Comrade Fidel Castro by U.S. agents

It is clear, even on the face of the indictment, that it was APSP's alignment on issues related to Russia and Ukraine that was the reason for its invitation to the AGMR conference in Moscow in 2015, and the basis of its alleged cooperation agreement with Ionov and the AGMR. The indictment does not allege that the APSP defendants ever agreed to advocate any position that did not align with their ideology. In fact, at the April 20, 2020, "Dialogue of Nations" conference, hosted by Ionov, and charged in the Superseding Indictment as OA 56, Ionov asked the APSP to unite with a California separatist group called YesCalifornia. But at the conference, recorded on video, APSP defendants Yeshitela and Nevel publicly denounced YesCalifornia as a racist group, and demanded that Ionov remove the group from future conversations.[27] This video shows definitively that the APSP defendants were not under "direction and control" of Ionov, and thus were not his "agents."

But even if it could be shown that the APSP defendants were somehow

opposed to Cuban freedom. Imperialism has imposed a blockade on Cuba, attempting to starve the people into submission, although the government in Cuba is duly elected by the people in Cuba.

And what about the imperialist-led 1987 assassinations of Comrade President Thomas Sankara of Burkina Faso (The Land of Stand-up Men) and the most recent hunting down and lynching of Libyan leader Muammar Gaddafi? Both these men were deposed because they attempted to redistribute the wealth of their respective territories.

*U.S. elections: A deadly fraud perpetrated against the people -specially Africans*!, The Burning Spear, Oct. 31, 2012, https://theburningspear.com/1143/.

[27] This episode is found at 1:13:00 of the Dialogue of Nations video, provided by the government during discovery, file name, "zoom_1.mp4."

influenced by Russia in their criticism of U.S. policy, their speech would still be protected. "The question, if the rights of free speech and peaceable assembly are to be preserved, is ... not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects." *De Jonge v. Oregon*, 299 U.S. at 365. Here, there is no allegation in the indictment that defendants' utterances transcend the bounds of free speech protections. Instead, the government seeks to criminalize lawful political speech based on "relations of the speakers." Such a prosecution is prohibited under the First Amendment.

In *De Jonge,* the defendant was convicted under an Oregon "criminal syndicalism" statute, for assisting in the conduct of a public meeting, otherwise lawful, held under the auspices of the Communist Party. She was sentenced to seven years in prison. *Id.* at 358. The Supreme Court reversed, holding that the Oregon statute as applied to the defendant violated the rights of free speech and peaceable assembly encompassed by the due process clause of the Fourteenth Amendment. *Id.* at 365.

> [P]eaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a

lawful public discussion as the basis for a criminal charge.

*Id.*

As in *De Jonge*, the defendants' participation in a peaceable assembly and a lawful public discussion cannot be the basis for a criminal charge. The speaker's relationship to the Communist Party in *De Jonge*, or to Russia as alleged in the case at bar, cannot justify the government's using criminal prosecution to suppress political speech.

Nor does the allegation in the Superseding Indictment that the APSP defendants were spreading "Russian propaganda and disinformation" justify criminal prosecution or suppression of political speech. See Superseding Indictment, ¶26(c). The government cannot remove constitutional protection from political speech by labeling it "propaganda and disinformation."

In *NAACP v. Button*, 371 U.S. 415 (1963), Virginia attempted to obstruct the NAACP's political strategy of using litigation to eliminate racial barriers by criminalizing the "solicitation" of any legal or professional business. *Id.* at 418-19. The NAACP sued to restrain enforcement of this Virginia law under the First Amendment. *Id.* at 417. In response, the State argued that "solicitation" is wholly outside the area of freedoms protected by the First Amendment. *Id.* at 429. The Supreme Court disagreed.

> To this contention there are two answers. The first is that a State cannot foreclose the exercise of constitutional rights by mere labels. The second is that abstract discussion is not the only species of communication which the Constitution protects; the First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion.... For the NAACP, litigation is a form of political expression.

*Id.*

The government does not have a monopoly on determining what is true and what is false. As the Supreme Court has repeatedly held, a healthy democracy depends on the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer v. Grant*, 486 U. S. 414, 421 (1988); *see also Herndon v. Lowry*, 301 U.S. 242, 259 (1937) (peaceful agitation for a change of our form of government is within the guaranteed liberty of speech); *Bridges v. California*, 314 U.S. 252, 270 (1940) ("it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions").

"Courts help to protect these democratic values in part by strictly scrutinizing certain categories of laws that threaten to 'drive certain ideas or viewpoints from the marketplace.'" *City of Austin v. Reagan Nat'l Adver. of Austin, LLC,* 142 S. Ct. 1464, 1477 (2022) (citing *R. A. V. v. St. Paul*, 505 U. S. 377, 387 (1992)). As the Supreme Court stated in *Roth v. United States*,

> The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests.

354 U.S. 476, 488 (1957).

In *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), the Court struck down a state rule requiring public school students to salute the flag. There, the Court noted

that "[s]truggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men." *Id.* at 640. The "[u]ltimate futility of such attempts to compel coherence is the lesson of every such effort." *Id.* at 641. "Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard." *Id.*

The fact that the APSP defendants are accused of opposing official government policy on an important matter of war and peace does not justify an exception to the rule. As the Court said in *Barnette*,

> Freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.
>
> ***
>
> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

*Id.* at 641-42.

Moreover, the views of these defendants, that the government calls "propaganda and disinformation," are nearly identical to the views held by well-renowned public intellectuals such as Professors Jeffrey Sachs of Columbia University and John Mearsheimer of the University of Chicago. In May 2023, Professor Sachs wrote a column for Common Dreams called, "The War in Ukraine Was Provoked—and Why

That Matters to Achieve Peace."[28] Herein, Sachs argues that the U.S. provoked Russia's invasion, first by its "intention to expand NATO to Ukraine and Georgia in order to surround Russia in the Black Sea region by NATO countries"; and second, by helping to install "a Russophobic regime in Ukraine by the violent overthrow of Ukraine's pro-Russian president, Viktor Yanukovych, in February 2014." In March 2022, Professor Mearsheimer wrote a column for the Economist called, "John Mearsheimer on why the West is principally responsible for the Ukrainian crisis"[29] in which he argued that the West, "and especially America, is principally responsible for the crisis [in Ukraine] which began in February 2014."

Professor Sachs was an adviser to three United Nations Secretaries-General, and is the author of several books on foreign policy and economics. Professor Mearsheimer is the author of numerous books on security issues and international politics. No one has suggested that the published opinions of Professors Sachs and Mearsheimer are not protected speech.

Further, even if it could be objectively proven that the APSP were wrong in their opinions about the war in Ukraine, their speech would still be protected. An "erroneous

---

[28] Jeffrey D. Sachs, *The War in Ukraine Was Provoked-and Why That Matters to Achieve Peace*, Common Dreams, https://www.commondreams.org/opinion/the-war-in-ukraine-was-provoked-and-why-that-matters-if-we-want-peace (May 23, 2023).

[29] John Mearsheimer, *John Mearsheimer on why the West is principally responsible for the Ukrainian crisis*, The Economist, https://www.economist.com/by-invitation/2022/03/11/john-mearsheimer-on-why-the-west-is-principally-responsible-for-the-ukrainian-crisis (Mar. 19, 2022).

statement is inevitable in free debate," and "it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive.'" *New York Times Co. v. Sullivan*, 376 U. S. 254, 271-72 (1964) (citing *NAACP v. Button*, 371 U.S. at 433). "Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about the clearer perception and livelier impression of truth, produced by its collision with error." *Id.* at 279 n19 (citation omitted).

Finally, the allegation in the indictment that the APSP received trivial sums[30] from Ionov to support their speaking tours and their public advocacy is immaterial. In *New York Times Co. v. Sullivan*, 376 U. S. 254 (1964), the newspaper was sued by a public official for a paid advertisement containing a defamatory falsehood relating to his official conduct. The Court held that "if the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement." The Court explained:

> That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold. Any other conclusion would discourage newspapers from carrying "editorial advertisements" of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities -- who wish to exercise their freedom of speech even though they are not members of the press. The effect would be to shackle the First Amendment in its attempt to secure "the widest possible dissemination of information from diverse and

---

[30] The superseding indictment alleges that the APSP received about $7,000 from Ionov or AGMR over the six years of their alleged collaboration.

antagonistic sources."

*Id.* at 266 (citations omitted).

**D.    A requirement of registration in order to make a political speech is incompatible with the First Amendment.**

The fact that Section 951 contains a registration requirement to avoid criminal prosecution does not save this indictment. "A requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." *Thomas v. Collins*, 323 U.S. 516, 540 (1945). "No one may be required to obtain a license in order to speak." *Id.* at 543 (Douglas, J., concurring).

In *Thomas,* the defendant was imprisoned under a Texas statute for failing to register as a "labor union organizer" prior to addressing a scheduled mass meeting held to "publicly proclaim the advantages of workers organization and to persuade workmen to join Local No. 1002 as part of a campaign for members." *Id.* at 533. The Supreme Court reversed on grounds that the "rights of assembly and discussion are protected by the First Amendment." *Id.* at 534. The *Thomas* Court found that "the requirement of registration ... was in itself an invalid restriction."

> As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly. Lawful public assemblies, involving no element of grave and immediate danger to an interest the State is entitled to protect, are not instruments of harm which require previous identification of the speakers....
>
> If the exercise of the rights of free speech and free assembly cannot be

made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order.

*Id.* at 539-40.

Similarly, in the case at bar, to the extent that Section 951 required the APSP Defendants to "notif[y] the Attorney General" before making the speeches and publishing the articles charged in the indictment, the Statute violates the First Amendment and must either be struck down or limited in scope.

This case would appear to be the first time in which a Section 951 prosecution has been challenged on First Amendment grounds, quite likely because it is the first case in which the government has used Section 951 to directly target political speech. In *United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005), the government prosecuted a publisher of an Arabic language newspaper under Section 951. But there, the defendant was alleged to be acting as a secret operative for Iraqi intelligence, helping Iraq learn the identity and whereabouts of opposition members living in the United States. *Dumeisi*, 424 F.3d at 570. Mr. Dumeisi was convicted by a jury. On appeal, he challenged the adequacy of the following jury instruction relating to his publishing activities:

> The First Amendment to the Constitution protects the right to free speech and the freedom of the press. This means that individuals are permitted to express views that are controversial or even despicable. The speech that Mr. Dumeisi gave at the Iraqi Mission and newspaper articles he authored or published are protected by the First Amendment. The speech and newspaper articles, as well as Mr. Dumeisi's opinion and political views, are to be considered only insofar as they may pertain to issues of motive and intent.

24

*Id.* at 579. The Seventh Circuit held that the above instruction met the defendant's concern "that his First Amendment-protected speech" would be used as the basis for a guilty verdict. *Id.*

The defendant in *Dumeisi* also appealed the denial of his motion to suppress "the fruits of all surveillance conducted under the FISA," alleging that "the facts presented to the FISC [Foreign Intelligence Surveillance Court] in support of the application for surveillance consisted solely of his First Amendment-protected activities as a journalist." *Id.* at 578. In reviewing this claim, the Seventh Circuit noted that the FISA statute contains the following restriction relating to First Amendment activities:

> Before authorizing electronic or physical surveillance, ... the FISC must find [probable cause] to believe that– "the target of the electronic surveillance is a foreign power or an agent of a foreign power: Provided, That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States."

*Id.* at 578-79 (citing 50 U.S.C. § 1805(a)(3).) The *Dumeisi* Court reviewed the materials relied upon by the FISC and concluded that the government provided probable cause that Dumeisi was an agent of a foreign power "entirely independent of any of his journalistic activities." *Id.* at 579.

Thus, in the FISA statute, Congress made sure that the government could not obtain a probable cause warrant to surveil a person suspected of being "an agent of a foreign power" based on protected speech. A similar limitation must be imposed on Section 951 to assure that this statute can never be used again to criminalize speech

25

protected by the First Amendment.

**E.    The Superseding Indictment must be dismissed as to Ms. Hess and the other APSP defendants to avoid the chilling effect upon the exercise of First Amendment rights that may derive from the fact of this prosecution.**

A criminal prosecution under a statute with an overbroad sweep that can be used indiscriminately by prosecutors to target protected speech, "usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). Dismissal of the indictment as to Ms. Hess and the other APSP defendants is necessary not only to protect the First Amendment rights of these defendants, but also to protect the rights of other Americans whose speech may be inhibited if this prosecution is permitted to go forward. As the Court stated in *Dombrowski v. Pfister*:

> Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression -- of transcendent value to all society, and not merely to those exercising their rights -- might be the loser.

*Id.*

So important are these values of free expression that the Supreme Court has "allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Id.* "We have fashioned this exception to the usual rules governing standing ... because of the 'danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and

26

improper application.'" *Id.* at 486-87 (citing *NAACP v. Button*, supra, at 433). "The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Id.* at 487.

Here, no exception to any rules governing standing is necessary. The APSP Defendants are being criminally prosecuted under Section 951 for their dissenting speech; they have standing to challenge the constitutionality of the statute.

The existence of a statute like Section 951, that can be used by federal officials to target dissenting speech, is itself a threat to free expression. In *Thornhill v. Alabama*, 310 U.S. 88 (1940), the Supreme Court struck down an Alabama statute that criminalized picketing a place of business to publicize facts of a labor dispute. There, the Court held: "The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Id.*, 97-98.

In the case at bar, the government is using Section 951 in a discriminatory manner to target a particular group that merits its displeasure. It has been widely reported that "[m]ore than a dozen prominent Washington research groups [a.k.a. think tanks] have received tens of millions of dollars from foreign governments in recent years while pushing United States government officials to adopt policies that often reflect the

donors' priorities."[31] None of these prominent D.C. think tanks that receive millions of dollars from foreign governments are ever prosecuted under Section 951 as unregistered foreign agents. Yet, members of the APSP, a small group of black activists who allegedly received about $7,000 to support speaking tours, are prosecuted under Section 951 for their disfavored speech.

For all of these reasons, dismissal of the superseding indictment is required as to the APSP Defendants.

WHEREFORE, based on the foregoing, Defendant Penny Hess respectfully moves this Honorable Court to enter an order dismissing the superseding indictment in the above-captioned case with prejudice.

Respectfully submitted,

/s/ Leonard C. Goodman
LEONARD C. GOODMAN

Leonard C. Goodman
Angela J. Reaney
Goodman Law Office
53 W. Jackson
Suite 1650
Chicago, Illinois  60604
(312) 986-1984

---

[31] See *Foreign Powers Buy Influence at Think Tanks*, The New York Times, Sept. 7, 2014, https://www.nytimes.com/2014/09/07/us/politics/foreign-powers-buy-influence-at-think-tanks.html.

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2023, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record via transmission of Notices of Electronic

Filing generated by CM/ECF.


      /s/   Leonard C. Goodman


Leonard C. Goodman
53 W. Jackson
Suite 1650
Chicago, Illinois 60604
(312) 986-1984