UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                             CASE NO. 8:22-cr-259-WFJ-AEP

AUGUSTUS C. ROMAIN, JR.,
    a/k/a "Gazi Kodzo"

**UNITED STATES' SENTENCING MEMORANDUM**

For seven years, the Defendant Augustus C. Romain, Jr., worked at the direction and control of the Russian intelligence services within the United States. As a leader of the African People's Socialist Party ("APSP"), he, among other things, promoted a four-city tour to charge the United States with genocide at the direction of the Russian government and plotted to operate a Russian-government built website that would post the personal identifying information of American police officers and judges. After founding the Black Hammer group, he continued to work on behalf of the Russian government to conduct multiple demonstrations targeting American companies for their political viewpoints as well as a self-described "attack mission" against a journalist. All the while, he and his co-conspirators concealed the involvement of the hidden hand of the Russian government, which was planning, directing, and funding their activities to harm this Country.

In light of these actions, as detailed below, the United States respectfully requests the Court to impose a sentence of 60 months' imprisonment, a $10,000 fine, and a three-year term of supervised release. This sentence is essential to reflect the

gravity of the Defendant's offense and serve as a deterrent to others who may consider partnering with hostile foreign governments to harm the United States.

## I.     Procedural History

On April 13, 2023, a federal grand jury returned an indictment charging the Defendant with conspiring to act as an agent of the Russian government without notification to the Attorney General, in violation of 18 U.S.C. §§ 371 and 951. The Defendant proceeded to trial. On September 12, 2024, the jury found the Defendant guilty as charged.

On November 4, 2024, the Probation Office issued the initial Presentence Report ("PSR") (Doc. 316). The PSR correctly notes that there is no sentencing guideline for the offense of conviction, nor is there an analogous guideline; therefore, the provisions of 18 U.S.C. § 3553 control the imposition of a sentence.

## II.    A sentence of 60 months' imprisonment is sufficient but not greater than necessary to serve the purposes of 18 U.S.C. § 3553(a).

The United States respectfully requests that the Court impose a sentence of 60 months' imprisonment. Looking first to the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), this is a particularly serious offense. For more than half-a-decade, the Defendant acted as an agent of a hostile foreign intelligence agency that considers the United States its "main enemy." Sept. 6, 2024 (Morning) Trial Tr. at 21 (Testimony of Prof. Thomas Rid). As the evidence at trial established, and the jury's verdict confirmed, the Defendant and his co-conspirators entered into

this conspiracy with the Russian government willfully, that is, "with bad purpose either to disobey or disregard the law." Doc. 284 at 11.

The evidence at trial underscored the evil intent behind this conspiracy. From the outset, codefendant Omali Yeshitela explicitly told the Defendant that the Russian government would use the APSP and other American groups across the political spectrum—including white nationalist groups and groups that the APSP would "NEVER" publicly associate with—to "sow division" within the United States. PSR ¶¶ 64-65. Indeed, as Professor Thomas Rid explained, the goal of these longstanding Russian intelligence operations is to "drive wedges into existing conflicts . . . and then crack them open and make them worse . . . to turn the target [country] against itself to make it weaker." Sept. 6, 2024 (morning) Trial Tr. at 14. And that is exactly what the Defendant and his co-conspirators helped the Russian government to do.

For example, in August of 2015, the Russian government, acting through Aleksandr Ionov, directed codefendant Penny Hess to publish a petition seeking to have the United Nations charge the United States with genocide against its own citizens—something that the APSP had never done in decades of activism. *Id.* ¶ 28. Hess initially refused and insisted that the Russians file the genocide petition, but eventually agreed to go along with the farce when Ionov reminded her that the Russian government was "not exactly black" to file the petition itself. *Id.* ¶ 29. Hess used her leadership petition in the APSP to cause the petition to be published and submitted to the United Nations. *Id.* Consistent with the understanding that this was

a covert influence operation, Hess ensured that the petition omitted any reference to the petition's Russian-government backing. *Id.*

In January of 2016, the Russian government paid $12,000 to Yeshitela and Hess to organize a tour around the United States to promote that genocide petition. *Id.* ¶¶ 44-48. Defendant Romain promoted this tour, and consistent with his co-conspirator's efforts to conceal the Russian government's role throughout this conspiracy, studiously avoided any reference to the Russian government or its leadership over this tour. *See* Gov. Trial Ex. 60.

Around this same time, the Russian government also made an offer to Yeshitela to create a doxing website targeting American police officers and judges—undoubtedly with the purpose of enticing the public to retaliate against these officers and judges. PSR ¶ 43. Yeshitela enthusiastically informed Hess, Romain, and others that the Russian government would build the website, and the APSP would operate it. *Id.* Yeshitela further stated that the APSP would use the website to post "pictures, names, . . . addresses" of police officers and judges. *Id.* Romain encouraged this idea and requested that the website be named "Pigs in our Hood." *Id.* In spite of Yeshitela and Romain's enthusiasm, it does not appear that the Russian government fulfilled its agreement to build the website.

After rising to the rank of Secretary General in the APSP, the Defendant founded his own group called Black Hammer. The Defendant used his leadership in Black Hammer to organize protests and other actions at the direction of the Russian government. For example, in March of 2022, the Russian government paid for the

Defendant and three members of Black Hammer to conduct a demonstration at Facebook headquarters to protest Facebook's policies relating to the Russian invasion of Ukraine. *Id.* ¶ 77. Shortly thereafter, Yeshitela directed a similar protest by APSP members, also at Facebook, on behalf of the Russian government. *Id.* ¶ 78. Both Black Hammer and the APSP refrained from any mention of the Russian government's role in directing these actions targeting a U.S. company for its political viewpoints.

In April of 2022, the Russian government directed the Defendant to use Black Hammer's social media presence to attack a journalist who had written articles critical of the Russian government. The Defendant followed through on Ionov's direction, reporting back: "I got you Comrade! Let's nail this bitch to the wall! You know I love an attack mission!" *Id.* ¶ 80.

In May of 2022, the Russian government directed the Defendant to demonstrate at CNN headquarters in Atlanta because of CNN's perceived views criticizing Russia's invasion of Ukraine. The Defendant conducted the requested demonstration that same day, using not only members of Black Hammer but numerous homeless individuals to conduct a demonstration attacking CNN for its views on the Russian invasion. *Id.* ¶ 82. Again, the Defendant hid the Russian government's role in planning this demonstration.

Thus, over seven years, the Defendant repeatedly took actions at the direction and control of the Russian government, always being careful to conceal the Russian government's role. These actions were calculated to promote division in the United

States and promote Russian geopolitical interests. Critically, the Defendant's and his co-conspirator's actions even allowed the Russian government to extend its authoritarian reach into the United States to punish American companies for their political viewpoints. The Defendant also used his leadership roles in two organizations to further this conspiracy and amplify its effects. These are serious crimes that require a serious sentence.

Next, the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), also support a substantial sentence. On the one hand, the Defendant has no prior criminal convictions. On the other hand, the Defendant's criminal conduct went undetected for at least seven years, and continued almost up to the day that the Defendant was arrested on racketeering and aggravated sodomy charges in Georgia. The Defendant's willful participation in a seven-year-long conspiracy supports the requested sentence.

A significant sentence also is necessary to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment," as well as to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B). Hostile foreign powers seek to use agents like the Defendant in order to pursue their own foreign policy agendas and to weaken the United States from within. The Defendant's actions in this case served both goals—working on behalf of the Russian government to exacerbate racial division and to punish private companies for views that displeased the Russian government. As this case illustrates, such covert operations are exceedingly difficult to detect and disrupt, often continuing for years

before they are uncovered—if they are detected at all. A substantial term of imprisonment is essential to send a clear and unequivocal message to foreign agents operating secretly on U.S. soil: you will be apprehended, and you will face severe consequences for your actions.

Finally, the Court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Each Section 951 prosecution is unique, and it is difficult to compare across cases due to the breadth and diversity of conduct that falls within Section 951's prohibitions. A 60-month sentence is entirely reasonable when compared to other sentences involving conspiracies to violate Section 951 cases.

For example, Judge Steven D. Merryday recently sentenced Ping Li to 48 months in prison and a $250,000 fine for conspiring to act as an agent of the People's Republic of China. MDFL Case No. 8:24-cr-334-SDM-NHA. Li acted as a "cooperative contact" on behalf of Chinese intelligence for over ten years. On one occasion, Li provided unspecified cybersecurity training information from his employer, and on several other occasions, provided publicly available information from Google searches relating to a variety of topics including Chinese dissidents, American public figures, and other topics requested by Chinese intelligence. Li had no criminal history, accepted responsibility for his actions when confronted by law enforcement, and pled guilty within weeks of his arrest.

In *United States v. Dumeisi*, the Defendant was sentenced to 46 months in prison for acting as an agent of Iraqi intelligence. Dumeisi was a newspaper publisher, and Iraqi intelligence asked him to print provocative articles in his paper to learn more about Iraqi dissidents, as well as to produce false press passes for Iraqi diplomats. 424 F.3d 566, 581 (7th Cir. 2005). Unlike Romain, it does not appear that Dumeisi exercised control over an entire group for the purpose of furthering a foreign government agenda.

The government's recommended sixty-month sentence is also consistent with factually-analogous cases such as *United States v. Manafort*, No. 1:17-cr-00201 (D.D.C. Mar. 13, 2019), ECF 547, wherein the defendant, in relevant part, pleaded guilty to conspiring to violate the Foreign Agents Registration Act (FARA) (a different but related statute) for acting as an unregistered agent of the Ukrainian government. In *Manafort*, despite the defendant's guilty plea, the court imposed a statutory maximum conspiracy sentence of sixty months. *Id.* Similarly, in *United States v. Vincent et al*, No. 1:05-cr-00059 (S.D.N.Y.), after a jury convicted the defendant, a court likewise imposed a statutory-maximum sixty-month sentence for conspiring to violate FARA.

In light of the duration of Romain's abuse of a leadership role in multiple groups in order to further a substantial conspiracy spanning years, a 60-month sentence is appropriate.

### III.   A fine of at least $10,000 is appropriate.

The Court must impose a fine unless the defendant can demonstrate that he is

unable to pay. *See United States v. McGuinness*, 451 F.3d 1302, 1307 (11th Cir. 2006);
USSG §5E1.2(a). Fines are collectible for 20 years from the date of the judgment
imposing the fine. 18 U.S.C. § 3613(b). Although the guidelines do not prescribe a
fine range, the statutory maximum fine is $250,000. PSR ¶¶ 98, 100; 18 U.S.C.
§ 3571(b); USSG § 5E1.2(c)(4).

The Defendant refused to provide any information during the Presentence
Report Interview. At trial, the Defendant boasted about his expensive dog, his
substantial income as a YouTube content creator, his large house, the many "rapper
celebrities" who lived in his neighborhood, and his three SUVs. *See* Sept. 9, 2024
Trial Tr. (Afternoon) at 10-11. On these facts, the Defendant has not carried his
burden of establishing that he does not have the ability to pay a fine.

In determining the amount of fine to impose, this Court shall consider, among
other factors, the expected cost to the government of any term of probation or term
of imprisonment and term of supervised release imposed. USSG § 5E1.2(d)(7); 18
U.S.C. § 3572(a)(6). The PSR estimates that the annual cost of his imprisonment is
$49,770. *Id.* at ¶ 101. Additionally, supervised release and/or probation comes at a
cost to the government that should be considered – the annual cost of supervision is
$4,387 per year. *Id.*

Moreover, payment of a fine would not unduly burden dependents because
the Defendant does not have any dependents. *See* 18 U.S.C. § 3572(a)(2); USSG §
5E1.2(d)(3). Another consideration in determining the fine is the amount of
restitution ordered. *See* 18 U.S.C. § 3572(a)(4). In this case, there will be no

restitution or forfeiture ordered and the Court can consider the full amount of his assets.

The court shall also consider the need for the combined sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence. *See* USSG § 5E1.2(d)(1). As previously explained, this is a serious offense, and deterrence is an important consideration in this case.

Further, fine payments directly benefit victims across the country because the fines are paid into the Crime Victims Fund. *See* 34 U.S.C. § 20101. Based on the foregoing, there is no reason to waive imposition of a fine. The United States respectfully submits that a fine of at least $10,000 is reasonable and appropriate under these circumstances.[1]

## IV.    Conclusion

The United States respectfully requests that the Court sentence the Defendant to 60 months' imprisonment, a fine of $10,000, and 3 years of supervised release. This sentence is essential to ensure appropriate punishment for the Defendant and to deter others from acting as covert agents on behalf of hostile foreign powers.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   */s/ Daniel J. Marcet*
Daniel J. Marcet and Risha Asokan
Assistant United States Attorneys

---

[1] The $10,000 fine is the low end of the fine guidelines for an offense level of 25, which is consistent with the government's sentence of incarceration of 60 months.

Florida Bar No. 0114104
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
E-mail:       Daniel.Marcet@usdoj.gov

Menno Goedman
Trial Attorney, National Security Division
U.S. Department of Justice
(Of Counsel)

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2024, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Mark O'Brien, Esq.

/s/ Daniel J. Marcet
Daniel J. Marcet
Assistant United States Attorney
Florida Bar No. 0114104
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:   (813) 274-6358
E-mail:       Daniel.Marcet@usdoj.gov